IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TECNIMONT S.P.A., | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No.<br>1:17-5167 (JBS/KMW) |
| HOLTEC INTERNATIONAL, | **OPINION** |
| Defendant. | |

APPEARANCES:

Gabriel Hertzberg, Esq.
CURTIS MALLET-PREVOST COLT & MOSIE LLP
101 Park Avenue
New York, NY 10178
      Attorney for Plaintiff

Adam Lurie, Esq.
LINKLATERS LLP
601 Thirteenth Street NW
Suite 400 South
Washington, DC 20005
      Attorney for Defendant

**SIMANDLE, District Judge:**

I.    **Introduction**

      This case involves a business dispute between Plaintiff, an
engineering, procurement, and commissioning contractor, and
Defendant, a manufacturer of (inter alia) steam condensers. The
parties entered into a contract for the purchase by Plaintiff of
steam condensers manufactured by Defendant. After certain
business disputes, described in more detail infra, Plaintiff

filed the instant suit, alleging defamation by Defendant to Plaintiff's client and business partners.

Presently before the Court is Defendant's Motion to Dismiss [Docket Item 12]. The principal issue to be decided is whether the arbitration clause contained in the contract between the parties mandates the dismissal of this suit and a referral to arbitration in its stead. For the reasons described herein, the Court concludes that it does, and will grant Defendant's Motion to as it relates to the Arbitration Clause, and will stay the case pending arbitration.

## II. Background[1]

Plaintiff Tecnimont S.p.A. is an engineering, procurement and commissioning contractor, based in Milan, Italy, that engaged in work on a project to build a large thermoelectric power plant in Punta Catalina, Dominican Republic (the "Power Plant"). [Docket Item 1 at 2.] Plaintiff's client and the owner of the Power Plant is Corporación Dominicana de Empresas Eléctricas Estales ["CDEEE"). Id. at 5. On April 14, 2014, CDEEE, Plaintiff, and Plaintiff's business partners, Constructora Norberto Odebrecht and Ingenieria Estrella, S.R.L.

---

[1] For purposes of the pending motion, the Court accepts as true the version of events set forth in the complaint, documents explicitly relied upon in the complaint, and matters of public record. See Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014).

(collectively the "Consortium"), executed an Engineering, Procurement and Construction Contract (the "EPC Contract") that governs the design and construction of the Power Plant. Id. Plaintiff estimates that the value of the EPC Contract is worth hundreds of millions of dollars. Id. Pursuant to the EPC Contract, Plaintiff is responsible for the design, construction, and commissioning of two Steam Condensers for the Power Plant. Id.

On October 29, 2014, Plaintiff placed an order ("Purchase Order")[Docket Item 12-2] with Defendant, Holtec International, a manufacturer of heat transfer equipment, to purchase a pair of steam condensers ("Condensers") for the Power Plant. [Docket Item 1 at 2.]

Under the Purchase Order, Defendant was to deliver the first fully tested Condenser in October 2015 and the second in December 2015. Id. However, Defendant did not manufacture the Condensers. Instead, Defendant subcontracted the manufacture of the Condensers to Godrej, a firm located in Mumbai, India. Id. Godrej had never manufactured the steam condenser of the type required for the Power Plant, so Defendant was supposed to provide qualified, skilled personnel from the United States to supervise and assist Godrej during the manufacturing process. Id. Plaintiff asserts that delivery of the Condensers was significantly delayed due to problems with Defendant's supply

chain and gross incompetence in connection with its subcontracting to Godrej. Id. at 6. Plaintiff alleges that as a result of Defendant's gross incompetence, the first Condenser was not delivered until October 2016 – a year behind schedule. Id. Defendant tendered the second Condenser on November 2016. Id.

Defendant asserts that the delay in tendering of the Condensers was due to a "Change Order." The Purchase Order is governed by the General Purchase Conditions ("GPC"). [Docket Item 12-2 at 38.] Article 5.1 of the GPC confers the right on the Respondent (Plaintiff Tecnimont S.p.A.) to request the Claimant (Defendant Holtec International) implement changes with respect to any goods and/or works supplied under the Purchase Order. Article 5.2 of the GPC provides that in the event of such a change, an equitable adjustment to the relevant price and/or time of performance mutually satisfactory to both Parties shall be discussed and negotiated by the Parties. Article 5.2 of the GPC requires the Respondent Tecnimont S.p.A. to make any such change request in the form of a "Change Order." [Docket Item 12-2 at 8.]

Defendant asserts that on May 2015, Plaintiff requested an alteration of the design provided for under the Purchase Order. Id. Defendant states that Defendant notified Plaintiff that the request changes would jeopardize the agreed performance schedule

and that Plaintiff failed to submit a Change Order as required by Article 5.3 of the GPC. Id. Defendant argues that Plaintiff "attempted to shift responsibility for the delays" on to Defendant by asserting that Defendant's management of the manufacturing process at Godrej was inadequate. Id. As a result of the dispute, Defendant alleges, Plaintiff has failed to comply with its obligations to settle four invoices issued by Defendant pursuant to the Purchase Order. Id.

Article 33.1 of the GPC states that "Any dispute between the PARTIES in connection with or arising out of the PURCHASE ORDER which cannot be settled amicably shall be finally settled by means of the proceeding specified in the SPECIAL PURCHASE CONDITIONS[.]" [Docket Item 12-2 at 63.] Article 32 of the GPC states that "The PURCHASE ORDER shall be governed by and construed in accordance with the Laws of the Country specified in the [Special Purchase Conditions ('SPC')]." Id. Article 32 of the SPC states that the Purchase Order shall be governed by the Law of England and Wales. [Docket Item 12-2 at 76.]

Article 33.1 (the "Arbitration Clause") of the SPC provides as follows:

> **Any question, dispute, or difference arising from or connected with the PURCHASE ORDER which cannot be settled in accordance amicable shall be finally settled by means of Arbitration in London.**

Id. (emphasis in original).

On October 11, 2016, the parties made an Amendment

Agreement. Id. at 126. Within that agreement, Article 8 of

Amendment No. 3 ("Claim Waiver") provides in pertinent part:

"With the exception of the remaining payment obligations of TCM

and the remaining performance obligations of Holtec under the

Purchase Order, the Parties hereby acknowledge and agree to

release the other party from any and all claims, counterclaims,

demands, rights or causes of action of any kind . . . " Id. at

128.

On January 12, 2017, Defendant sent a letter to CDEEE,

Plaintiff's client. The letter was circulated to the Consortium.

Id. The letter generally characterizes Plaintiff as difficult to

work with and specifically refers to a "myriad of non-payment,

contract amendment and change order issues" associated with

working with Plaintiff on the delivery of the Steam Condensers.

[Docket Item 1-1 at 2.]

Upon receipt of the letter, various members of the

Consortium have advised Plaintiff to resolve the situation with

Defendant. [Docket Item 1-2; 1-3; 1-4.]

In response to the letter, Plaintiff filed a Complaint and

Demand for Jury Trial on July 14, 2017. [Docket Item 1 at 1.][2] In

---

[2] Defendant alleges that the Complaint in this matter was
actually filed as "part of a groundless scheme by [Plaintiff] to
avoid its contractual obligations to [Defendant], and to
retaliate against [Defendant's] efforts to require [Plaintiff]

connection with the letter Defendant sent to CDEEE, the complaint alleges tortious interference with contract, existing economic advantage, and prospective economic advantage; and defamation. Id. at 10-15. Specifically, Plaintiff asserts that it will have to expend time, money, and resources on an investigation and additional testing of the Condensers required by CDEEE in light of the letter. Id. at 8. Plaintiff also asserts damage to its reputation and its business relations with the Consortium. Id.

In response to the Complaint, Defendant submitted a Notice of Motion to stay the case in favor of arbitration (and to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)). [Docket Item 12.] This Motion is presently before the Court.

In its Brief in support of the Motion, Defendant argues that Plaintiff's complaint should be stayed in favor of arbitration; in the alternative, it argues that the complaint should be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Id. at 15. Defendant also argues that Defendant's communications with CDEEE are privileged and thus,

---

to honor such obligations. Indeed, [Plaintiff] files the Complaint only two days after [Defendant] appropriately initiated arbitration in London against [Plaintiff] for, among other things, failure to pay [Defendant] as the parties' contract requires." [Docket Item 12-1 at 7.]

not defamatory under New Jersey's qualified interest privilege. Id. at 24.

In response [Docket Item 14], Plaintiff asserts primarily that the alleged defamatory statements fall outside the scope of the arbitration agreement. Id. at 12. Plaintiff also argues that the Claim Waiver and Arbitration Clause cited by Defendant are invalid due to the agreements being signed under economic duress. Plaintiff also argues that the Court should not consider Defendant's supplemental exhibit (the Declaration of English Law ("Carroll Declaration" [Docket Item 12-3]) offered by Defendant's counsel, Ben Carroll). Id. at 23. Plaintiff also argues that the application of the New Jersey Common Interest Privilege to this matter is inappropriate. [Docket Item 14 at 25.]

Defendant's Reply [Docket Item 15] argues that the claims asserted in the complaint are properly subject to arbitration per the Arbitration Clause's broad scope, that the Court should consider the Declaration, and that the common interest privilege should apply. Id. at 8, 12, 16.


### III. Standard of Review

In the Third Circuit, when a party moves to compel arbitration based on the terms of an agreement, courts apply a two-tier standard of review. See Guidotti v. Legal Helpers, 716

F.3d 764 (3d Cir. 2013). Where it is apparent on the face of the complaint, or in documents relied upon in the complaint, that the claims at issue in the case are subject to arbitration, the case is considered under a motion to dismiss standard, Fed. R. Civ. P. 12(b)(6). Id. at 774-76. However, where the complaint does not establish on its face that the parties have agreed to arbitrate, or where the party opposing arbitration has come forward with reliable evidence that it did not intend to be bound by an arbitration agreement, then the parties are entitled to limited discovery on the question of arbitrability before a renewed motion to compel arbitration is decided on a summary judgment standard. Id.

When considering a motion to dismiss a complaint for failure to state a claim, Fed. R. Civ. P. 12(b)(6), the Court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the non-moving party. A motion to dismiss may be granted only if the plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests that make such a claim plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). Although Rule 8 does not require "detailed factual allegations," it requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555).

## IV.  Analysis

### A. Scope of Arbitration Clause

Defendant seeks to stay the case and compel arbitration. Neither party disputes their entry into a valid and enforceable arbitration agreement. However, Plaintiff asserts that its claims herein of Defendant's alleged defamation and tortious interference with Plaintiff's business relationships are not covered under the scope of the arbitration agreement.

Under the Federal Arbitration Act ("FAA") 9 U.S.C. §§ 1 et seq., courts are required to stay any action subject to a valid arbitration agreement and order arbitration. The Supreme Court has held that the FAA reflects "the national policy favoring arbitration agreements." Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006).

This court applies a two-step test in determining whether an arbitration clause is applicable: (1) whether a valid arbitration clause exists; and (2) whether the particular dispute falls within the scope of the arbitration agreement. Trippe Mfg. Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005). The Trippe court cited AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 650, (1986) in stating that "when determining both the existence and the scope of an arbitration agreement, there is a presumption in

favor of arbitrability." "A court cannot force a litigant to submit to arbitration any dispute which he has not agreed so to submit." Id. at 648. Furthermore, if the claims asserted fall outside the arbitration agreement, they are not subject to arbitration. Painewebber, Inc. v. Hofmann, 984 F.2d 1372, 1377 (3d Cir. 1993).

Here, there is no dispute as to the existence of an arbitration agreement set forth in Article 33.1 of the parties' SPC, as evidenced by both parties being signatories to it and neither party raising any disputes over the existence of the agreement. The most pressing question in consideration of Defendant's motion to dismiss is the second Trippe factor, whether the particular disputes (defamation and tortious interference with business relations) fall within the scope of the arbitration agreement.

The parties' arbitration clause is set forth in broad language, as noted above, stating that "[a]ny question, dispute or difference arising from or connected with the PURCHASE ORDER which cannot be settled in accordance amicably shall be finally settled by means of Arbitration in London." [Docket Item 12-A, at 2 (emphasis in original).]

The Third Circuit has repeatedly given broad construction to phrases such as "arising under" and "arising out of." Battaglia v. McKendry, 233 F.3d 720, 727 (3d Cir. 2000).

11

This broad construction applies because "the federal policy in favor of arbitration is 'particularly applicable' where the arbitration clause at issue is broad." Id. at 725. Considering the strong federal policy favoring arbitration, provisions such as the present one must be "generously construed" in favor of coverage. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625 (1985); AT&T, 475 U.S. at 650 ("Doubts should be resolved in favor of coverage").

Despite this, Plaintiff still argues that its claims for defamation and tortious interference do not fall within the scope of the parties' agreement. [Docket Item 14 at 12.] Plaintiff argues, in substance, that the arbitration agreement was between Plaintiff and Defendant in connection with the purchase order for steam condensers; because its claims are based on Defendant's "defamatory, and extra-contractual" statements made by Defendant to Plaintiff's clients after the delivery of the condensers, the claims do not fall within the scope of the arbitration agreement. Id. at 15. Plaintiff goes on to argue that its claims "are not related to work [Defendant] performed under the contract" and that Plaintiff "did not, and would not have, agreed to arbitrate claims that arise after the Condensers were delivered and that do not relate to the contract." Id.

Plaintiff does not, however, engage directly with the broad language of the arbitration clause, which by its explicit terms applies to all disputes "arising from or connected with" the purchase order.

The crux of Plaintiff's argument is that its claims are based on extra-contractual statements made by Defendant to a third-party (Plaintiff's client and business partners) that is not party to the contract at issue. Plaintiff asserts that the line of cases cited in support of arbitration such as <u>Buckeye</u>, <u>Trippe</u>, <u>Battaglia</u>, and <u>Mitsubishi</u>, all concerned relatively standard disputes concerning arbitration agreements. That is, the disputes were between two signatories of an arbitration agreement about the construction, scope, or performance of the agreement. Those specific cases did not discuss the application of arbitration agreements to extra and/or post-contractual communications involving parties that are not party to the arbitration agreement or the transaction that the agreement is meant to cover. Nevertheless, this factual situation is not a novel one.

This circuit has contemplated arbitration disputes similar to the present one. In <u>Wood v. Prudential Ins. Co. of Am.</u>, 207 F.3d 674 (3d Cir. 2000), the plaintiff sued his former employer for discrimination. The plaintiff was party to a valid arbitration agreement but sought to bring a claim of defamation

in relation to the defendant's forwarding of plaintiff's termination letter to the New Jersey Department of Insurance after the termination of his employment. Id. at 681. In affirming the District Court's decision to compel arbitration and in recognition of the broad construction given to the arbitration agreement's use of the phrase "arising under," the Wood court held that because "the alleged defamation was a description of Wood's activities while employed at Prudential and was contained in Wood's termination letter, we hold that the claim of defamation arose out of his employment and its termination. Thus, Wood's defamation claim is arbitrable." Id. (emphasis added). Similarly to Wood, the arbitration agreement here is broad and the question of its scope before the court concerns claims arising from communications with third parties. The defamation alleged in Wood is comparably connected to the relationship of the parties covered by the arbitration agreement. In Wood, as in the present case, the defendant's communication to a third party concerned defendant's version of plaintiff's performance under their contractual relationship. Moreover, the scope of the arbitration clause in the present case is broader, covering disputes not only "arising from" but also "connected with" the underlying agreement. A claim "connected with" the contract need not "arise from" the contract. One cannot escape the conclusion that claims for

defamation and tortious interference with contract, economic advantage, and prospective economic advantage based upon defendant's assessment of plaintiff's performance in their Purchase Order relationship are connected with or arise from that relationship, and are therefore arbitrable.

Leadertex v. Morganton Dyeing & Finishing Corp., 67 F.3d 20 (2d Cir. 1995), the only case Plaintiff cites in favor of its proposed narrow construction of the Arbitration Clause [Docket Item 14 at 14-18], may provide further guidance on the issue. Similar to the present case, the parties in Leadertex entered into a series of sales contracts which contained arbitration clauses which provided "any controversy or claim arising under or in relation to" the contract would be subject to arbitration. 67 F.3d at 23. After a dispute between the parties arose concerning defective goods, Leadertex raised a defamation claim based on slanderous statements Morganton allegedly made to a Leadertex customer. Id. Specifically, Morganton stated that Leadertex was: (1) generally dishonest in its business practices, (2) incapable of supplying conforming goods to manufacturers, (3) in the practice of selling defective goods to manufacturers, and (4) guilty of attempting to defraud the customer by shipping it defective goods. Id. at 28. In holding that the defamation claim was beyond the scope of the arbitration agreement, the court found the defamatory statements

to be "subjects other than Morganton's services for Leadertex."
Id. at 29. Again, that contrasts to the present case in which
Holtec's comments directly concerned Tecnimont's performance of
the underlying contracts.

Sharma v. Oriol, No. 05 Civ. 2727(SAS), 2005 WL 1844710,
*1-5 (S.D.N.Y. Aug. 2, 2005) added further insight into the
reasoning of Leadertex. Sharma (the CEO of his company, TTA)
misrepresented TTA's profits, thus making the sale of TTA to
Oriol fraudulent. Id. at *1. At a meeting Oriol made various
allegedly defamatory statements in connection with Sharma's
fraudulent sale of TTA. Id. at *1-2. The purchase agreement that
Sharma and Oriol entered into was subject to an arbitration
agreement that Oriol sought to enforce with regards to Sharma's
defamation claim. In distinguishing the case from Leadertex, the
Sharma court noted that "the alleged defamation addressed
Leadertex's general qualities rather than the specific
relationship between Leadertex and Morganton." Id. at *4. In
contrast, the defamatory statements alleged in Sharma

> refer[red] either explicitly or implicitly to the sale
> of TTA LLC by Sharma and TTA Inc. to defendants
> Patentes Talgo and Talgo America. To varying degrees
> of specificity, each statement asserts that Sharma
> behaved fraudulently in connection with the sale.
> Nothing in the statements extends beyond the way in
> which the sale was entered into.  The statements thus
> concern a core issue of the contractual relationship
> between the parties -- specifically, the fairness of
> the purchase price of TTA LLC. Accordingly,
> plaintiffs' claim is arbitrable.

Id. at *5 (emphasis added; citations omitted).

Here, the nature of the extra-contractual communications between Defendant and Plaintiff's client is very similar to the notice of the alleged defamatory statements made in Sharma. Defendant's letter to CDEEE concerns a core issue of the contractual relationship between Plaintiff and Defendant – specifically the delay in the delivery of the steam condensers contracted for in the Purchase Order. [Docket Item 1-1.] Unlike Leadertex, which Plaintiff relies on, Defendant's statements were not related to Plaintiff's character, but to the parties' contractual obligations. In Defendant's letter to CDEEE, Defendant expressly referred to their "interaction with Tecnimont on the supply of the plant's Surface Condenser, and associated myriad of non-payment, contract amendment and change order issues." [Docket Item 1-1 at 2.]

Here, it is abundantly clear that the present dispute "arises under" the Purchase Order. In fact, Defendant Holtec's letter to CDEEE precisely addresses disagreements concerning the Purchase Order, namely, "non-payment" and contractual amendments. That Holtec addressed its comments to CDEEE (the owner of the power plant) and not to the world at large further demonstrates that this defamation dispute is one "connected

with" the agreement to provide the generators to CDEEE's power plant.

In observance of the strong federal policy in favor of arbitration and in consideration of the comparable disputes concerning arbitration in Leadertex and Sharma, this court will grant Defendant's motion to stay this matter pending arbitration, as the Court finds the parties agreed to arbitration pursuant to a broad arbitration clause that covers the claims at issue here.

### B. Duress

As an alternative ground for its motion to dismiss, Defendant cites the Claim Waiver signed by the parties in October of 2016 and submits that, on the basis of such waiver, the Court should dismiss this action. [Docket Item 12-1 at 23-24.] While the Court does not reach this argument, finding that the Arbitration Clause applies to this dispute, the Court briefly notes that Plaintiff argues in a footnote that it would "demonstrate that Holtec compelled Tecnimont under duress to agree to this amendment [i.e., the Claim Waiver] by threatening to withhold delivery of the Condensers, which would have exposed Tecnimont to substantial damages under the CDEEE contract." [Docket Item 14 at 25.]

A party asserting economic duress bears a high evidentiary burden. Under New Jersey Law,

> "[a] party alleging economic distress must show that he has been the victim of a wrongful or illegal act or threat" that "deprived the victim of his unfettered will." <u>Continental Bank of Pennsylvania v. Barclay Riding Academy, Inc</u>., 93 N.J. 153, 175-76, <u>cert. denied</u>, 464 U.S. 994 (1983)(citations omitted).In determining whether economic distress has been shown in a particular case, "the 'decisive factor' is the wrongfulness of the pressure exerted." <u>Id.</u> at 177. However, 'where there is adequacy of consideration, there is generally no duress.'" <u>Id.</u> (citations omitted).

<u>Campbell Soup Co. v. Desatnick</u>, 58 F. Supp. 2d 477, 492 (D.N.J. 1999).

While Plaintiff argues that it would be inappropriate to dismiss based on the Claim Waiver as it would seek to submit extrinsic evidence to show duress, the Court notes that Plaintiff does not allege that its initial agreement to the Arbitration Clause (as opposed to the Claim Waiver) was precipitated by economic duress.

Accordingly, the Court declines to deny the motion to stay pending arbitration on these alternative grounds since the duress claimed by Plaintiffs does not relate to the formation of the Arbitration Clause. Whether an amendment to the underlying contract is enforceable is, of course, a matter for the arbitrator.

**C. Other Arguments**

Defendant asserts several other arguments in support of its Motion, arguing that the Complaint: must be dismissed pursuant to the Claim Waiver [Docket Item 12-1 at 23-24]; is precluded by New Jersey's common interest qualified privilege, id. at 24-31; fails to adequately plead defamation, id. at 31-33; and fails to adequately plead tortious interference, id. at 33-36.

Plaintiff disputes all of these arguments, arguing that: the argument premised on the Claim Waiver is premature and not appropriate for disposition before discovery has occurred [Docket Item 14 at 23-24]; the "common interest privilege does not apply in this case[,]" id. at 25-28; the Complaint adequately pleads defamation, id. at 18-21, and tortious interference, id. at 21-23.

Again, because the Court rules that the Arbitration Clause covers the claims pled in the Complaint, the Court will stay the case pending arbitration, per the parties' agreement, and does not reach or decide the above issues raised in the briefing.[3]

---

[3] As the Court does not rely on the Carroll Declaration or its discussion of the law of England and Wales in order to resolve this Motion, it need not further discuss, nor resolve, the dispute between the parties about the appropriateness of the Court's consideration of the Carroll Declaration.

## V.    Conclusion

For the reasons described above, the Court will grant Defendant's Motion in favor of arbitration. The accompanying Order will be entered.


**August 13, 2018**                    **s/ Jerome B. Simandle**
Date                                    JEROME B. SIMANDLE
                                        U.S. District Judge